06-3499, Messrs. Vandenberg and Minkiewicz. It seems like an auspicious time to hear an appeal concerning Burma. Least auspicious for the petitioner. Whenever you're ready. May it please the court. My name is John Vandenberg. I'm from the firm of Pogen and Vandenberg, LLC. That's offices in Philadelphia and Wilmington. I represent the petitioner, Mr. Myot Thu, today for oral argument. I would like to reserve two minutes. That's granted. This is a case where his brother's been granted asylum in 2000, but this person was found and the immigration judge made it clear that if it wasn't for the adverse credibility determinations, the person might have gone the other way. But there were inconsistencies in his testimony versus what he had said previously. Do you want to go through those and see how you would explain them, keeping in mind that we're no longer bound or it isn't a question of whether the inconsistencies go to the heart of the claim? Yes, Your Honor. Actually, that was one of the issues in researching this is there's very, very little guidance now that real ideas come up. Normally these cases take quite a bit of time to come to the courts of appeal. They're all old. I'll touch on those. And there's also a case that recently came out on September 7th of the Seventh Circuit with Judge Richard Posner writing it, titled Cadia. And I've actually got the Lexus side on that, 2007 U.S. cap, 21-456. That particular case, unfortunately, didn't deal with the Real ID Act case. However, he did deal with the Real ID Act and comment on that. In any issue, what's also important and what I'd like to point out to the court is, indeed, the BIA's decision and the IJ's decision is based on adverse credibility findings. But when you look closer into the record, what they're building that on doesn't appear to be in the record, as the judge pointed out. Well, he arrives at JFK. He tells the immigration officials when he arrives and two days later that he had never been arrested. And then at the IJ hearing, he first claimed that he admitted the arrest because he thought the official was only asking whether he had been arrested during a certain time period. And then when asked why he thought that, given that the question simply asked whether he had been arrested, he gave another answer. But that's hard to say that's not inconsistent. Actually, Your Honor, a closer look at the record, the government submitted a supplementary appendix that was quite useful. And if you'll take a look at page 310 of the supplementary appendix submitted by the government, it's the page after where the government asks him, have you ever been arrested? And he said no. But on the very next page, they ask him, why are you afraid to go back? And he says, I was beaten by police officers. Well, it's not the question that's being put to you, Mr. VanBurgh, is not whether he said some things that were consistent. It's help us understand how to deal with the things he said that were inconsistent. Okay. If the court's looking at how do we mesh the Real ID Act versus the previous law on this issue. So we're looking, we're comparing that with the Senate Theoraga that also brought in a couple others. There is a Real ID Act question, but in the person, and you may be answering Judge Ambrose's question more directly in that vein, I'm still back on the factual point to try to find out, look, are there, can you rationalize the record in a way that perhaps the IJ didn't see and understand? Most certainly, Your Honor. Or put it another way, can you say that for each individual adverse credibility determination that there was not substantial evidence supporting that? That's correct, Your Honor, and that there is, and that evidence compels. That's going to be tough. Well, I'll do my best, Your Honor. As far as the initial interviews at the airport, and there's a credible fear interview as well, the law governing that, and we can talk a little bit about Real ID as well, recently set out a case, Chukwu, which was later vacated for formatting errors. And it's also depending on a Second Circuit case, Ramsa Mishiri, and I can give the site to that. Basically setting out four different factors to look at when there's an airport or a credible fear interview. The first is does the record merely summarize, if the record merely summarizes, it's less reliable. Second, questions not designed to elicit details or failing to ask a follow-up question also cast doubt on the reliability of those documents. Third, it's less reliable if there's a condition where the person is less reluctant to tell what happened to them to the questioner because of conditions in the home country. And fourth, if the answer suggests there's a problem with English or the translator, it loses even more credibility. Both of these documents on which the judge and the Board of Immigration Appeals base their decision are deficient when you line it up against these criteria. First, indeed, both of those documents merely summarize, well, correction, the credible fear interview merely summarizes in approximately three to four paragraphs what he told the credible fear officer, the asylum officer. We don't have the transcript of what he actually said. Second... But we do know what he said at the hearing, just that the hearing was inconsistent. Well, actually, if I could, Your Honor, what he said at the hearing under oath is what happened. And also note that he told the judge, I spoke to my attorney and he told me that I have to tell everything. So a person that's coming from Burma, an incredibly repressive society in which many persons are informers, how is he going to tell who to trust? He went through two government persons and finally got to an attorney, his attorney, and he relied on that attorney's advice. And you have to note that in the transcript, he sticks to it. We'll go on to other statements. But at the hearing, he gave three responses as to why he didn't say he was arrested. First, he said he thought it was for a certain time period, and then when it was noted to him that they merely said, well, have you ever been arrested, he then explained that he had very little experience regarding the answering of questions and that he was, quote, very excited, close quote, at the time. And then later on, he stated that he was afraid the officer might not like his answer, which is probably one of my guesses is what really happened in the spur of the moment. He was afraid that the person wouldn't like his answer because you're not going to let somebody into this country who says that he's previously been arrested, or he might not, that might not happen. But that's inconsistent. It's hard to say it isn't. Actually, Your Honor, I'd posit that when you put those together, read separately, the judge characterized it as he's not telling me the truth. He's given me three separate explanations. But if you look at them one after the other, you put them side by side, it's reasonable when you look at it. Is this his first language? Is English his first language? It's not. And remember also that initial airport interview was given in English, not in Burmese. Second, I have little experience. I'm excited. Now we're dealing through a Burmese translator at this immigration court hearing. Could excited have meant anxious? Could excited have meant scared? How did he translate that word? It's not clear from the record. And finally, as you mentioned, Your Honor, might not like the answer. What happens if I tell them I was arrested? In any event, the service failed, and this comes back to the four criteria. Why didn't the service ask him, oh, you're afraid of being beaten by the police? Why? The next question is, very generally... Because initially he thought he'd never been arrested. But then why did he... Again, Your Honor, looking at the criteria, is there an English language problem here? There's a good probability that is. There was an interpreter at the hearing, right? At the hearing, yes, and that's where everything came through.  which is at the airport without an attorney, and it's custodial. On to the next one. How do you misidentify your brother as your cousin? That was a question I had as well, Your Honor. I can give an explanation for it, but it's not on the record. It's not held within the record. Sandy Kahn, the original attorney on this, not the original, but the one that took it to the board, to the board and to this court, is herself Burmese, and I asked about that because it was sticking for me as well. She explained, most likely a translator error. In Burmese, it's a matriarchal society where when a man gets married, he goes and lives with the wife's family, and your first cousins live with you. I tried that here. It didn't work. Understandable. I've been through that myself, Your Honor. But what happened is he... That word, she said, I always have to ask a follow-up question to say, do you mean, because the translation is brother, cousin, or brother. You have to ask, is it your brother, cousin, or your brother, in order to get that. That stuck out to me as well. How do you explain that? She believes it's a linguistic issue. That if that translator didn't follow up and ask, do you mean your cousin, brother, or your brother, it wouldn't come out. It could be translated either way. Assuming we were to accept that as a fact and a case, how do we deal within the constraints of the record we've got? I think, Your Honor, that that would be considered a failure to build the record on the part of the immigration judge and the Board of Immigration Appeals. That's an issue that's outstanding. Now, if that's all that the Board of Immigration Appeals has left, is what could possibly be a misinterpretation, I'd argue that this court, that this demands a remand to figure that out. If that's all that they've got, that would be terrible to send a man back. And we're talking of Burma here. This person has been detained ever since the moment his plane landed. He still remains detained in his warehouse in Alabama at this time. As the government attorneys often argue, he has the keys in his hand to get out of prison. Simply drop this petition. And yet he hasn't. He prefers to sit in a prison in Alabama. To have a person in that situation based on what could very well be a translator error of cousin versus cousin, brother. But if he gets out of prison, he goes to Burma, right? If he gets out of prison, he goes to Burma, exactly. I gather that there was no credibility problem with the fact that he had been in Japan and worked for the BDA. And the immigration judge found that that was not enough to support the claim for asylum. But if he had worked for the BDA in Japan, and went back to Burma, what would he expect to happen? We set it out quite clearly that he would expect, if he were caught, to be severely punished, killed, tortured. Is that sufficient for a cap petition? Actually, Your Honor, I'm not an immigration judge. I'd argue that it is sufficient, and here's the reason. Even if, let's say, the government argues it doesn't matter, he has no political opinion. We're going to knock that out. Under the Convention Against Torture, one need not have a fear of being tortured based on one of the five statutory grounds. So he could still prevail. Further, the immigration judge and the Board of Immigration of Appeals overlooked a second piece of evidence not mentioned in her decision, which is a letter from the editor of a Burmese dissident newspaper located in Florida, funded by the National Endowment for Democracy, who says, I have looked through my records of the Tokyo office and found his name mentioned. So this is a piece of corroborating evidence that the judge never brought up in her decision. And as far as corroborating, if I could just add, in addition to that, the country conditions from the Department of State, if you look at the Department of State report on page 363 of the supplemental affidavit, you have to have a license to own a fax machine, any type of two-way communication. So it was not reasonable for her to expect what she's asking for in that case. And then the real ID has to be reasonable totalitarianism. A few seconds we have left. As I understand, let's assume for the moment that there were inconsistencies and is the test that we go under now that you take into account the credible evidence that existed and perhaps the additional evidence, we'll discuss that with the government, that it was not considered about the widespread human rights violations in is that what we look at? That is, Your Honor. And there's actually support for that in the Kadia decision from Judge Posner, in that you can look at what is the credible evidence in the record. I'm also bringing in some additional evidence that the judge did not consider in her decision. And I'd also point out that under a previous decision, a Third Circuit verishy, this is fatal. Indeed, verishy set out that there are matters in which a person would be unable to provide any corroboration. So that would be a reasonable test, Your Honor. Thank you. We'll hear from the government. Good morning, Your Honors. If it pleases the Court, Stuart Minkowitz, Assistant United States Attorney for the District of New Jersey on behalf of Acting Attorney General Peter Keisler. Here, as Judge Roth noted at the outset, every day we're hearing something about the situation in Burma. And we've heard a lot for a number of years. The situation doesn't appear to be getting any better. It appears, based on what we're reading, to be deteriorating. And yet, I didn't see that the IJ considered at all the evidence of the widespread human rights violations that have been and currently are extant in that country. Your Honor, based upon my reading of the record, there was discussion about the State Department report being submitted to the Court. I didn't see it in the decision. It's not in the decision, Your Honor, but it is in the proceedings where she had requested it directly from counsel for the petitioner. Doesn't the IJ have to... Does she have to consider it? I mean, it's not enough just to have the paper and the record. Is there some indication that this was considered? Let me add a quote of that question. I'm not saying things have changed for the worse over there, because I don't know. But certainly, something's happening over there. Is that anything that we can or should take cognizance of when we're talking about this case, that there's widespread press reporting now, today, yesterday, of government repression, crackdown on public dissent? There's no question that certainly this could be the subject of something that would be part of a motion to reopen before the BIA. But this was going on back when the hearing went on, too. It's in the news right now, but it's certainly been going on for quite a while. Certainly, Your Honor. But just as equally, people have been deported back to Burma during this entire time with findings that the conditions under there are not sufficient that anybody returning would be subject to persecution upon return. What would the government's position be in response to a motion to reopen, if you based on changed conditions, current conditions? Your Honor, in anticipation of these questions, I did discuss these issues with the Deputy Director of the Office of Immigration Litigation in Washington yesterday, and I also spoke with the Department of Homeland Security, the Deportation Department. Boyle's position at this time is that in this particular instance, in this particular case, this was not a case that was subject to remand in the case based upon the credibility of determinations. However, they would make no representation as to what would occur if a motion to reopen were made before the BIA based upon change of country circumstances, which would be an exception to the late filing. So I cannot answer for the agency. I did speak to the Detention Department, just anecdotally, because I anticipate also the Court would want to know. As of this moment, the agency has no plans to deport this particular alien, nor do they have plans to deport anybody at this moment to Burma. That's a good anticipation. That being said, our position would be, Your Honor, that if there were any form for this issue to be heard, it would be before the BIA. Would you be willing to agree to a remand to the BIA to consider that matter? Your Honor, we would not, and the reason being is because I'm sorry, because of the IPCC aspect. Yes, Your Honor. If you want to hear any argument with relation to the inconsistencies in the testimony, I mean, there were two or three glaring inconsistencies, and I have to say, Your Honor, I have reviewed several of these types of cases before. This is one of the longer opinions I've heard from an IJ, and also a five-page opinion from the BIA is almost unheard of on a case like this. Well, I can't remember a longer one from the BIA. There are a few, but this is one of the longer ones. I can go back about six or seven years before I can think of one. By the way, Your Honor, just to defer that particular argument I just passed, this court in Ambar, Sunni, held that the decision to seek a remand in a particular case is discretionary, and the law does not require the government to screen out and seek a remand unless the conditions have gotten worse. Strengthening an alien's assignment claim, or for that matter, the converse. The point is, while you'll not affirmatively seek a remand, the doors at least open for a motion to reopen. Arguably. I don't hear you telling me the government's going to oppose that. I can't tell you whether we'd oppose it or not. It would be, obviously, the burden of the petitioner to come forward and establish and change country conditions and that their country conditions are significant enough to warrant a reopening, and once it's reopened, that in fact the country conditions will have an effect, change countries will have an effect on that particular petition. I can't answer for the agency, but that opportunity is always there, and it would appear to me, just from my own personal review, that this particular petition might have that ability to at least make that application. With regard to the inconsistencies, the IJ pointed out three glaring inconsistencies which went to the actual heart of the matter. I think the primary one, of course, is the one that Your Honor raised earlier, which is the fact that he didn't mention that he was arrested in Burma in 1995, I believe it was. Now, he, there are three different stories and versions he gives to the IJ as to why he omitted that language. But, it seems to me, if you also read the proceedings beforehand, you'll note that in the earlier proceeding, his brother was present to be heard as a witness. There was some procedural errors made  the petitioner's counsel to provide an affidavit as to the and he never did provide it. And so the judge said, I'm going to hold this over for another, I believe it was about eight or nine days, so that you can put that affidavit in and I'll hear from the brother and if the brother can't appear personally, I'll take his testimony by phone. At that time, petitioner chose not to put his brother testimony into evidence. Nevertheless, His brother was granted asylum in 2000. Is he still living in this country? I honestly don't know, Your Honor. I am assuming so, but I don't know. It seems to me, he had a brother who was in this country from 2001. Before he came to the United States, he traveled through Singapore and Germany. He clearly had a relationship with his brother before coming here because his brother came to the hearing initially to testify on his behalf, if it in fact was his brother. I don't believe that this petitioner didn't have the resources in which to figure out how to obtain asylum. His brother had already done it years before. I don't think this is the case of a novice petitioner. I don't think this is a case where he can claim ignorance. I think this is a case where he clearly had the ability to bring corroborative evidence, chose not to for whatever reason. With regard to counsel's explanation as to why, anecdotally, why he may have given the evidence to his cousin initially, his own testimony said that he deliberately did not tell the truth to the asylum office because he was afraid it was going to get his brother in trouble. It wasn't because there was a language barrier as was proposed. He testified that it wasn't a language barrier. It was simply because he didn't want to get his brother in trouble. That's clearly an inconsistency. I don't know if it's the strongest inconsistency that the judge relied on. I think the judge particularly relied on the one that he wasn't arrested. The second major inconsistency, I think, in my view, and which the IJ considered, was that he claimed in his paperwork, in his application, that he had returned to Burma in the intervening time. But he leaves this out later on. Correct. And also later on, actually, he indicates that later on he returned to Burma. Plus, he admits he returned to Burma in 2005 for a nine-month period. And I think this shows lack of fear of future persecution or even past persecution. He returned to this country. He had already been an activist. He returns again in 2005. While he's there, he's bringing dissident information over the border, self-admittedly. And then he hears that his two friends who he had traveled to the country with eight years before were arrested. He has no direct knowledge of it. And he claims he fled because of that. I think there's a clear knowledge in his mind that he didn't mention the fact that he had returned to Burma because he truly did not have a fear of returning to Burma. There is no evidence in the record whatsoever. And he was given an opportunity to provide corroborating evidence as to how or why he fled. As to whether he was arrested or not. The conditions his father was even under. No corroborative evidence other than his testimony, which was really found to be credible by the EIJ and reasoned itself.  Thank you. Thank you. If I may, Your Honor, just to touch on what the government set out. As far as the options for a motion to reopen based on changed country conditions, that is possible. But as you mentioned, Judge Jordan, this is not a no opposition. Motions to reopen are disfavored, as said out in Savoy and versus Ashcroft. Anything can happen and the government is going to continue to hold this adverse credibility finding against them. And whatever motion to reopen, he files. But the government has already made... What are you asking us to do? You're asking us to overrule an adverse credibility finding? Your Honor, what we're asking this court to find is that that adverse credibility finding is not based on evidence in the record. And I can point that out, and I've done before. As far as not previously mentioning an arrest, that is a semantic issue. Because if you look on the very next page, the only interview by the government that we have a transcript of, I was beaten by police. But the test for us is whether there is substantial evidence supporting a finding. How in the world can we say there isn't substantial evidence to support the... Your Honor, as far as that brief return that the government brought up, that is... Two mentions on that. One, if I could, respectfully, the immigration judge seems to have played a game of got you on that with everything right in here, not allowing for any minor error. This is trivial, Your Honor. Plus, I'd also like to point out that the attorney on page 286 took responsibility... That's correct, Your Honor. So if those inconsistencies are not there, she said it would be a close call. I took a look at that before I came up, and I remember she said it was a close call, but maybe she would be... I would take that as sure. I'm sure you're right, Judge. So with that, I would have to ask the court to, at a minimum, remand it so that the record, because we've got serious issues here. If her decision, which the Board of Immigration Appeals specifically relies on, on its final page, these factual issues, if those are not supported by the record, it has to be remanded. It has to be vacated. You know what bothers me is that the immigration judge says, I don't find... This is on page 47 of the appendix. I don't find that the mere fact that he did work with the Burma Democratic Action Group in Japan would be adequate to establish that he has a well-founded fear of persecution if he returns to Burma at this time. Well, you know, I'm not sure that that is accurate. If... It sounds as though she's saying I at least believe that part of his testimony, but it's not enough. But would that be enough? I mean, certainly if the Burmese authorities are aware of the fact that he worked with protest groups in Japan, he would get a very harsh welcome on his return to Burma, and I am concerned that that is an incorrect consideration, conclusion, when she says that alone is not enough. Do you think it's enough? I think it's enough, Your Honor. That is plenty... Whether it's a well-founded fear of future persecution or not. You can base it on a fear, even if, arguendo, you got rid of the previous detention and beating. You can base it on a well-founded fear. Remember, we've got a letter from the National Endowment for Democracy Fund organization saying his name is in documents, he's in danger. With the State Department report, this person's in danger. You look at the other, whether we have two letters, one sign and one not, there's very strong indications. And again, looking back at the decision Judge Ambrose was on the panel with the late Judge Becker, there's serious indications that part of these records were not considered. And that, I submit demands of vacation and a remand. Well, let me pursue that for just a minute. I think it's fair to say, I mean, reading this record, you see that it comes across to me anyway, that the immigration judge was not entirely unsympathetic to your client, but your client created some problems for himself. One of the things that's been referred to by counsel for the government, Mr. Minkowitz, when he said, look, the judge held open this record to give an opportunity for corroborative evidence. And it just never, and I mean, the judge made it clear that the brother doesn't have to show up, hear by phone, do what we need to do. It looks like some effort was made here to give your client the chance to repair some of the damage that your client did to himself. And that didn't happen. What, you know, is the government right that there's, I don't want to put the words in Mr. Minkowitz's mouth, but that there's something to be inferred from that, which is there is no corroboration. Well, I'd reply to that, Your Honor, that two things. One, I don't recall the judge basing that anywhere in her decision that the brother or cousin, brother or cousin, didn't show. That's not a part of her decision. And as far as her being sympathetic to him, let me stop you. There's a statement here that this is in reference to this is on, you know, there's so many pages. Page 31, in the circle 47, it's over in the right-hand corner 76. But she's talking in the context of government authorities showing some interest to him when he goes back to Burma in 2005 and we're ignoring the 1998 period. And that's the arrest period. So therefore he says he heard from somebody else that these two friends of his got arrested. Now, of course that's not corroborated on the record because we have no statements in the second hand that they were. So I read that and I understand her to be looking for corroborative evidence. When you say she wasn't paying attention to that, how do you square it with that statement? Your Honor, as far as corroborative evidence she is, it looks as an effort, Your Honor. But I also kind of contrast that with some of the footnotes that she put in in particular on page 143 of the government supplementary appendix. Basically the attorney said, I goofed. He never before said, I went back to Burma earlier after his father was arrested. He never said it in his testimony. It's in that in support of the I-589. Again, I believe it's unsigned. When the attorney said, I goofed. I flubbed it. In her footnote on page 143 of the supplementary appendix, she says no, he doesn't need to take responsibility. I'm going to believe this person that I've already found not credible. Second, if you take a look farther down on page 147, another footnote, she says, well I would have liked to have seen perhaps some evidence from the wife. In the very next sentence, or a couple it happens to be somebody who's probably hoping to come to America on his coattails because she's included in the application along with the child. So that gives me the feeling, your honor, that I want some corroborating evidence, but not that. And if I don't know on that, in Burma, if you'll note, again, in the administrative record page 363 from the Department of State report, nobody gets fax machines. If you get caught with a cordless telephone that's unlicensed, you get three years in prison. So getting information from Burma, which we've seen in the news, is a lot different from getting information from other countries. It is a lockdown military hunt. Thank you. Mr. Mickwood, if you could just come up to the photo for a second. And the question that was asked or noted by Judge Roth or Mr. Vandenberg relating to the IJ's decision. Do you have a response to that? If I remember correctly, Judge Roth was concerned about the judge. Her statement at page 47. But assuming he did work with them, I don't find that the mere fact that he did work with the Burma Democratic Action Group in Japan would be adequate to establish that he has a well-founded fear of persecution if he returns to Burma at this time. I believe, Your Honor, a couple of things come to mind. First, there is no evidence at all in the record that the government or the military or anybody in Burma was keeping track of him, was keeping tabs on him in any way, shape, or form. Were they keeping track of the Burma Democratic Action Group in Japan? There's no evidence of that either. If they were, would that be... We'd be making a huge assumption that's not on the record and then could have been put into the record, perhaps. How would he know whether the Burmese government was keeping... Well, certainly there was a letter from the organization itself, and I don't believe that they mentioned that he would be in danger because first of all, it doesn't even establish that he was a member of the group. It just says that he was working with them. So it's not clear. Go to the legal point, though, if you wouldn't disagree with which is assuming that he were a member of this group and that there was enough evidence in the record to satisfy us that this, you know, that being a member of that group would get you beat up in Burma, a bad thing. Is it a legally erroneous statement by the IJ to say that that's not enough to prevent future persecution? I do not believe so, Your Honor. I don't believe it's an error on behalf of the IJ. I don't think it's a misinterpretation of law. Why? The IJ has to make a determination whether or not an individual is going to reasonably fear future persecution. There is no evidence before her that simple membership in this political organization... But there is such evidence. There's the page, appendix 65, the letter from U Thong. I know about many men like him had disappeared in Burmese military prisons on their return after saying that Fu's name was among, did appear in the records in Japan. So there is evidence in the record that that activity in and of itself True, but it would still be the IJ's prerogative to weigh the sufficiency of the weight of that evidence. Clearly she didn't find that particular piece of evidence to be enough to establish in her mind I don't think it's unreasonable that this alone would make this particular petitioner subject to persecution upon his return. I don't think it's an unreasonable assumption. I would also say that the mere fact that he returned after joining that organization... He did, but he also engaged in business there. It wasn't exactly he returned in clandestinely, but he remained there openly. He conducted business. His friends disappeared and then he got out. If you believe his testimony that his friends disappeared, or at least he had heard from someone that his friends had been arrested, but there's no direct evidence of it. But if you believe his testimony, he was still there for an eight month period of time in which he did business freely, but he even disseminated this information across the board. His fear couldn't have been that great based upon his membership in this organization in Japan, because he went right back into the den, the lion's den, so to speak. I mean, there are people in protest groups that go back into the lion's den. Thank goodness. There are, but then but then We don't know, but anyway I am not sure that it is a reasonable conclusion that he should have no fear of return if he's a member of this group. Even if that is the case, Your Honor, I would still submit to you that it would still not overcome the threshold of establishing the fact that he would in fact be persecuted upon his return. He may have some fear, but I mean, I'm sure he has some trepidation. Anybody has trepidation about returning to the country of origin after they've entered another country illegally. The question is, when does it cross the threshold? We're talking about Myanmar. We aren't talking about There's no question. There's no question about it, but we return people and deport people to countries all over the world, and unfortunately most of these countries don't enjoy the freedoms that we do here. Can I take judicial notice of what I read in the New York Times? I would ask that you want to do not, but Thank you very much. Thank you. Thank you both counsel for well presented arguments. We'll take the matter under advisement. We're going to take a ten minute recess. We will come back at ten minutes after twelve. Silence. I